72 Cal.Rptr.3d 58 (2008)
159 Cal.App.4th 1089
In re Joseph ROZZO, on Habeas Corpus.
No. D049704.
Court of Appeal of California, Fourth District, Division One.
February 5, 2008.
*60 Roger S. Hanson, Santa Ana, for Petitioner.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie Garland, Assistant Attorney General, Anya M. Binsacca, Linnea D. Piazza and Collette C. Cavalier, Deputy Attorneys General, for Respondent.
*59 AARON, J.

I.

INTRODUCTION
Joseph Rozzo murdered Richard Heggie in 1980. A jury found Rozzo guilty of second degree murder, and he is currently serving a sentence of 16 years to life. Rozzo filed this petition for writ of habeas corpus challenging the Governor's reversal of a decision of the Board of Parole Hearings (Board) granting Rozzo parole.
In his statement of reasons explaining the basis for his reversal of the Board's decision, the Governor concluded that the nature of the murder, Rozzo's criminal history and his misconduct inside of prison, and Rozzo's lack of insight regarding why he committed the murder, outweighed other factors that supported a grant of parole. The Governor further determined that the gravity of the murder alone was a sufficient basis on which to deny parole.
In describing the circumstances of the murder, the Governor noted that Rozzo, along with a group of other men, abducted Heggie as Heggie was walking along the side of the road. After the men abducted Heggie, Rozzo, together with other members of the group, beat Heggie over a prolonged period of a time. The men uttered racial slurs while they were beating Heggie. When Heggie attempted to escape, Rozzo and one of the other men in the group, Roland Talamantez, chased Heggie down and killed him. After they killed Heggie, Rozzo and Talamantez laughed about the killing and talked about it with the other members of the group. Rozzo told the group that he knew Heggie was dead because Rozzo had shoved his thumbs into Heggie's Adam's apple and Heggie's Adam's apple had burst. The Governor concluded that the circumstances of the crime went "well beyond that required to sustain a second-degree murder conviction."
In his petition for writ of habeas corpus, Rozzo's primary claim is that the Governor's decision violates Rozzo's right to due process because there is not sufficient evidentiary support for the decision. In In re Rosenkrantz (2002) 29 Cal.4th 616, 665, 128 Cal.Rptr.2d 104, 59 P.3d 174 (Rosenkrantz), the Supreme Court held that the extremely deferential "some evidence" standard of review applies to our review of the Governor's decision to reverse a grant of parole by the Board. In In re Dannenberg (2005) 34 Cal.4th 1061, 1095, 23 Cal. Rptr.3d 417, 104 P.3d 783 (Dannenberg), the Supreme Court stated that this standard is satisfied if the Governor cites to evidence of the committing offense that exceeds "the minimum elements of that offense." (Id. at p. 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783, italics omitted.) In this case, the Governor clearly cited "some evidence" that Rozzo committed a crime that involved "violence or viciousness ... more than minimally necessary to convict him of the offense for which he is confined." (Ibid., italics omitted.) Accordingly, we *61 reject Rozzo's claim. We also reject Rozzo's other contentions, and deny the petition.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. The commitment offense

At Rozzo's November 2005 parole suitability hearing before a panel of the Board, the presiding commissioner recited the following summary of the facts of Rozzo's commitment offense into the record:[1]
"On July 30, 1980 at approximately 9:30 a.m. a motorist driving on [H]ighway 79 near [Warner] Springs California discovered the body of Richard Heggie.... [A] sheriff[`]s deputy was summoned and upon arrival determined the victim was dead. The sheriff[] observed signs of a scuffle near the body [and] the coroner determined that Heggie had deep abrasions in the front throat area and both left and right sides of his neck. The abrasions were inflicted on a downward slant as though caused by fingernails. Numerous other bruises were presented on the victim[`]s temple, eyebrow, cheekbones, and on the left side of the torso and chest. Small amounts of blood [were] oozing from the victim[`]s mouth. An autopsy [was performed and] the coroner discovered blood in the chest cavity and [a] large ... hematoma on the right temple area of the victim's head. The throat was noted to have a crushed larynx, and a broken neck. The cause of death was [c]ited as substantial injuries to the neck and head areas.
"A subsequent investigation revealed that on July 29, 1980 Joseph Rozzo, Ronald Talamantez, Kenneth Jorman, Glenn Duro, John Cassell, and other individuals were driving to an Indian reservation when they observed a[B]lack man[,] Rich Heggie[,] walking on the side of the road.... [Rozzo and other members of the group began] beating him with their fists and making racially derogatory statements. Heggie was then thrown in the back of the truck and continued to be beaten by his assailants. Heggie apparently did not actively resist the beating but plead[ed] to be left alone. [Heggie] was then removed from the truck bed and forced into the tru[n]k of one of the other vehicles. The group took Heggie to a turn around along the side of the road.
"Removing [Heggie] from the tru[n]k [the group] ... continued beating him. Rozzo and Talamantez hit and kicked the victim repeatedly while saying you are going to die now nigger. Heggie screamed while the beating continued begging them to let him go, and not to kill him. Talamantez and Rozzo ceased beating him and drank beer while Heggie crawled into a ditch. They [Talamentez and Rozzo] followed [Heggie] and proceeded to beat him again. Upon returning to the truck Heggie and Talamantez told the group that Heggie was dead. Rozzo stated that he [wa]s sure [that Heggie was dead] because [Rozzo] shoved [his] thumb into [Heggie's] [A]dam[`]s apple and it burst."

B. Rozzo's jury trial, conviction, and appeal

Rozzo was charged with first degree murder and three special circumstances: *62 murder by torture (Pen.Code,[2] § 190.2, subd. (a)(18)); racially motivated killing (§ 190.2, subd. (a)(16)); and murder committed during a kidnapping (§ 190.2, subd. (a)(17)). The jury found Rozzo guilty of second degree felony murder, with kidnapping as the underlying felony. On appeal, this court affirmed Rozzo's conviction. (People v. Rozzo, supra, D000422.) In a concurring opinion, Justice Staniforth stated the following, "The evidence here warrants a first degree (premeditated or torture) murder finding. I concur in a second degree holding only because I know of no way to raiseeven on a retrialthe degree of guilt to first degree murder." (People v. Rozzo, supra, D000422 (conc. opn. of Staniforth, J.).)

C. Rozzo's parole suitability hearings

In 1990, Rozzo attended his first parole suitability hearing. Hearings were subsequently held on nearly a yearly basis. In all hearings prior to 2005, Board panels determined that Rozzo was unsuitable for parole. A Board panel held an 11th parole suitability hearing for Rozzo in November 2005. At the conclusion of that hearing, the panel determined that Rozzo was suitable for parole, concluding that he would no longer pose an unreasonable risk to society or a threat to public safety if released from prison.
In support of its decision, the Board panel noted that Rozzo had no juvenile record nor any record of assaulting others while in prison. In addition, Rozzo has enhanced his ability to function within the law by participating in educational programs, and has received his GED. Further, Rozzo has been involved in self-help programs and vocational programming while in prison. Rozzo has received excellent job performance ratings. The panel also stated that because of maturation and his advanced age, Rozzo has a reduced probability of recidivism. The Board affirmed the panel's decision in March 2006.[3]

D. The Governor's reversal of the Board's grant of parole

In March 2006 the Governor reversed the Board's decision to grant Rozzo parole. In his accompanying statement of reasons, the Governor described the circumstances of the murder in a manner similar to the description in part II.A., ante. In evaluating these circumstances, the Governor agreed with Justice Staniforth's observation that the evidence warranted a first degree murder finding with premeditation or torture. The Governor stated that he agreed with the statement made by a commissioner in Rozzo's 2002 parole hearing that, relative to other cases involving second degree murder, Rozzo's offense was "`the worst one, or one of the worst ones we've ever seen.'"
The Governor further stated:
"The facts of this crimeMr. Talamantez's suggestion that the group go `hunting,'[4] the prolonged and horrific beating inflicted by Mr. Rozzo and his crime partner, and the racial slurs used by both men during the attackgo well beyond that required to sustain a second-degree murder conviction. The *63 gravity of this shocking crime alone is sufficient for me to conclude that Mr. Rozzo's release from prison would pose an unreasonable public-safety risk."
In addition to his description of the murder, the Governor detailed Rozzo's criminal history prior to the murder as follows:
"Mr. Rozzo was 30-years-old at the time of the offense, and has an adult criminal history that escalated in severity. In November of 1969 he was arrested for disturbing the peace and received a 30-day suspended sentence and one year of probation. In 1971 he was arrested for possession of marijuana for sale in July and sentenced to 180 days in jail and 36 months of formal probation; according to him, he violated probation by participating in a robbery, and was sent to prison. In October of 1971 he was arrested for possession of marijuana and sentenced to one year of probation. In 1973 he was arrested for possession of dangerous drugs in February and possession of drug paraphernalia in September; neither arrest led to a conviction. In February of 1974 he was arrested for robbing an avocado orchard owner with a sawed-off shotgun and was found guilty of second-degree robbery and was sentenced to one year-to-life in prison plus a concurrent sentence of two-to-ten years for violating probation; he served two years and was paroled, but he violated his parole and was sent back to state prison. In 1976 he was arrested for petty theft in January, violating parole in July for which he was sentenced to four days in jail, and misdemeanor hit and run in December for which he was sentenced to 30 days in jail."
The Governor determined that "Rozzo's history of serious criminal misconduct weighs against parole suitability."
The Governor also noted that Rozzo had been disciplined four times for various prison rules violations, including falsifying state documents, attempting to introduce contraband into his unit, possessing dangerous contraband in his cell, and refusing to submit to a urinalysis. The Governor noted that Rozzo had remained discipline free for 20 years and found this fact "encouraging," but stated, "nevertheless [Rozzo] engaged in serious misconduct in prison."
The Governor also noted that Rozzo continued to blame his commission of the crime on his consumption of alcohol and to deny that the crime had been racially motivated. The Governor noted that Rozzo stated during the 2005 parole hearing that the crime would not have happened if he had not been under the influence of alcohol.
During Rozzo's 2005 parole hearing, the deputy district attorney requested that the commissioners ask Rozzo whether the murder had been racially motivated. Thereafter, the following colloquy occurred:
"[Commissioner]: Was this a[ ] racially motivated offense?
"[Rozzo's counsel]: I am sorry that gets into the fact[s] Commissioner.
"[Commissioner]: He asked the question I am only asking Mr. Rozzo. You don't wish to answer the question?
"[Rozzo's counsel]: I think he took his right to not speak about the crime today, thank you Commissioner."
"[Deputy District Attorney]: So my question[ ] cannot be answered."
Although the Governor did not specifically refer to this exchange in his statement of reasons, the Governor concluded that Rozzo "still seems to lack insight into why he committed such a terrible crime."
The Governor also considered factors that supported a grant of parole. The Governor noted that while incarcerated, Rozzo had earned a GED, become highly *64 skilled in welding, held numerous jobs within the prison, and participated in an array of self-improvement groups. The Governor noted that Rozzo had received numerous commendations for his performance in various prison jobs and his participation in self-help programs. The Governor stated that these factors supported Rozzo's release from prison, and also noted that Rozzo had made "realistic, confirmed plans upon parole."
The Governor concluded by stating, "[T]he especially grave and atrocious crime committed by Mr. Rozzo, his history of misconduct both inside and outside of prison, and his lack of insight into why he committed the crime presently outweigh[ ] the factors tending to support his parole suitability." The Governor continued, "The gravity of this shocking crime alone is sufficient for me to conclude that Mr. Rozzo's release from prison would pose an unreasonable public-safety risk."

E. Rozzo's petitions for habeas corpus

Rozzo filed a petition for habeas corpus in the trial court. In his petition, Rozzo claimed that the record did not support the Governor's decision. The trial court commented that the murder had been "racially motivated" and that it "was prolonged and involved torture and a callous disregard for the victim's suffering." The court determined that there was "some evidence" to support the Governor's decision and denied the petition.
Rozzo subsequently filed this petition for writ of habeas corpus in this court.

III.

DISCUSSION

A. There is some evidence to support the Governor's decision finding Rozzo" unsuitable for parole

Rozzo claims that the Governor's reversal of the Board's decision violates his right to due process because it is "supported by no evidence whatsoever." Specifically, Rozzo claims that because "no evidence in the record supports the notion that petitioner's conduct was `especially grave and atrocious'in the abstract or when compared with other murdersdenial of parole on that basis violated his protected liberty interest in his parole date." We disagree.

1. Standard of review

In Rosenkrantz, supra, 29 Cal.4th 616, 128 Cal.Rptr.2d 104, 59 P.3d 174, the Supreme Court held that prisoners in California have a liberty interest in parole suitability decisions and that this interest is protected by due process of law, as embodied in the state constitution. (Id. at pp. 655, 658, fn. 12, 128 Cal.Rptr.2d 104, 59 P.3d 174.) The Rosenkrantz court further held that due process requires that there be "some evidence" in the record before the Board that supports a decision by the Board to deny parole or a governor's decision to reverse a grant of parole. (Id. at pp. 652, 664, 667, 128 Cal.Rptr.2d 104, 59 P.3d 174.) In outlining the quantum of evidence necessary to satisfy this standard, the Rosenkrantz court emphasized the exceedingly deferential nature of the appealable standard of review:
"`Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by [the Governor]. [Citations.]' [Citation.] [¶] Thus, the `some evidence' standard is extremely deferential and reasonably cannot be compared to the standard of *65 review involved in undertaking an independent assessment of the merits or in considering whether substantial evidence supports the findings underlying a gubernatorial decision." (Id. at p. 665, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
Rozzo requests that we apply the substantial evidence standard of review to his claim. However, we are bound by the California Supreme Court's holding in Rosenkrantz that the "some evidence" standard of review applies in this context; (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.) Accordingly, we reject Rozzo's request.

2. Governing law

a. The statutes governing suitability for parole for prisoners who are serving indeterminate life sentences

Section 3041, subdivision (a) provides in relevant part, "One year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5." Section 3041, subdivision (b) provides in relevant part, "The panel or the board, sitting en banc, shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

b. The Board's regulations concerning prisoner suitability for parole

Title 15, section 2402, of the California Code of Regulations outlines the manner by which the Board is to determine whether a prisoner such as Rozzo is suitable for parole.[5] Subdivision (c) of that section *66 provides a nonexclusive list of "Circumstances Tending to Show Unsuitability." Included among these circumstances are the following pertaining to the commitment offense:
"(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
"(A) Multiple victims were attacked, injured or killed in the same or separate incidents.
"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
"(C) The victim was abused, defiled or mutilated during or after the offense.
"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
"(E) The motive for the crime is inexplicable or very trivial in relation to the offense." (Cal.Code Regs., tit. 15, § 2204, subd. (c)(1).)

c. The Governor's power to review the Board's decision

Article V, section 8(b) of the California Constitution provides in relevant part:
"No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on *67 the basis of the same factors which the parole, authority is required to consider."
Section 3041.2 specifies the manner by which the Governor may exercise his constitutional power of review of the Board's decision:
"(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority.
"(b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision."

d. Case law

In Rosenkrantz, the Supreme Court held that "[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. [Citations.]" (Rosenkrantz, supra, 29 Cal.4th at p. 682, 128 Cal.Rptr.2d 104, 59 P.3d 174.) The Rosenkrantz court acknowledged that in some situations, a decision denying a prisoner parole solely on the basis of the circumstances of his commitment offense might violate due process:
"In some circumstances, a denial of parole based' upon the nature of the offense alone might rise to the level of a due process violationfor example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set `in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public....' (Pen.Code, § 3041, subd. (a).) `The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen.Code, § 190 et seq.) [¶] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.' [Citation.]" (Id. at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
In Rosenkrantz, the petitioner had been convicted of second degree murder for the killing of his brother's friend, Steven Redman. Prior to the murder, the petitioner had been in a fight with Redman and Redman had revealed petitioner's homosexuality to petitioner's father. (Rosenkrantz, supra, 29 Cal.4th at pp. 627-628, 128 Cal.Rptr.2d 104, 59 P.3d 174.) In summarizing the facts of the murder, the Rosenkrantz court noted: "The Governor's decision stated that petitioner `brutally murdered' his victim after `a full week of careful preparation, rehearsal and execution.' The decision further stated that petitioner fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he *68 lay on the pavement." (Id. at p. 678, 128 Cal.Rptr.2d 104, 59 P.3d 174.) After the murder, the petitioner remarked to a nurse at a psychiatric hospital that he had done "society a favor" by killing Redman. (Id. at p. 672, 128 Cal.Rptr.2d 104, 59 P.3d 174.) In addition, at some point after the murder, the petitioner purchased more ammunition for the gun that he had used to kill the victim, for the purpose of "shooting up" his brother's automobile. (Ibid.)
In considering the legal significance of these facts, the Supreme Court stated:
"[T]he Governor has emphasized certain circumstances of petitioner's offense, as well as his postoffense conduct, that involve particularly egregious acts beyond the minimum necessary to sustain a conviction for second degree murder. Accordingly, the Governor properly could consider the nature of the offense in denying parole. [¶] Therefore, we conclude that the Governor's decision finding petitioner unsuitable for parole is supported by some evidence." (Rosenkrantz, supra, 29 Cal.4th at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
In Dannenberg, supra, 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783, the Supreme Court returned to the issue of the circumstances under which a denial of parole based solely on the grounds of the nature of a prisoner's commitment offense might violate due process. The Dannenberg court stated, "When the Board bases unsuitability on the circumstances of the commitment offense, it must cite `some evidence' of aggravating facts beyond the minimum elements of that offense. (Rosenkrantz, supra, 29 Cal.4th 616, 658, 683[, 128 Cal.Rptr.2d 104, 59 P.3d 174].)" (Dannenberg, supra, 34 Cal.4th at pp. 1095-1096, fn. 16, 23 Cal.Rptr.3d 417, 104 P.3d 783.), The Dannenberg court clarified that, "[o]ur use of the phrase `particularly egregious,' [in Rosenkrantz] conveyed only that the violence or viciousness of the inmate's crime must be more than minimally necessary to convict him of the offense for which he is confined." (Dannenberg, supra, 34 Cal.4th at p. 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783, quoting Rosenkrantz, supra, 29 Cal.4th at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
In considering whether such evidence existed in the case before it, the Dannenberg court stated:
"Here, as in Rosenkrantz, the parole authority pointed to circumstances of the inmate's offense suggesting viciousness beyond the minimum elements of second degree murder. As the Board noted, Dannenberg reacted with extreme and sustained violence to a domestic argument. He struck multiple blows to his wife's head with a pipe wrench. Bleeding profusely, she then 'fell or was pushed' into a bathtub full of water, where she drowned: Though he vehemently denied it, the evidence permitted an inference that, while the victim was helpless from her injuries, Dannenberg placed her head in the water, or at least left it there without assisting her until she was dead. The parole panel's questions to Dannenberg showed its reasonable skepticism about his surmise that, while he was briefly unconscious during their struggle, the victim crawled to the tub, placed her face under the faucet, accidentally struck her head on the tap, and fell into the water.
"Thus, there clearly was `some evidence' (Rosenkrantz, supra, 29 Cal.4th 616, 658[, 128 Cal.Rptr.2d 104, 59 P.3d 174]) to support the Board's determination that Dannenberg's crime was `especially callous and cruel,' showed `an exceptionally callous disregard for human suffering,' and was disproportionate to the `trivial' provocation. Accordingly, under *69 Rosenkrantz, the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date." (Dannenberg, supra, 34 Cal.4th at p. 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783.)
In In re Van Houten (2004) 116 Cal. App.4th 339, 10 Cal.Rptr.3d 406 (Van Houten) the court reasoned that if a prisoner's offense "is characterized by the presence of special circumstances justifying punishment by death or life without the possibility of parole, then these special circumstances are `particularly egregious acts beyond the minimum necessary to sustain' the conviction," and are, accordingly, a sufficient basis on which to deny parole. (Id. at p. 352, 10 Cal.Rptr.3d 406, quoting Rosenkrantz, supra, 29 Cal.4th at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.) After considering the evidence contained in the record in that case, the Van Houten court concluded:
"[T]here is some evidence that Van Houten's offense involved multiple murders, the commission of robbery during the murders, and racial hatred. Given the character of these aspects of Van Houten's offense as special circumstances under current law justifying a higher degree of punishment, we find the record contains `some evidence' that Van Houten's offense involved `particularly egregious acts beyond the minimum necessary to sustain' the conviction. (Rosenkrantz, supra, 29 Cal.4th at p. 683[, 128 Cal.Rptr.2d 104, 59 P.3d 174].) Therefore, the Board would have been justified in relying solely on the character of the offense in denying parole, and the Board was justified in relying primarily and heavily on the character of the offense in denying parole." (Van Houten, supra, 116 Cal.App.4th at pp. 352-353, 10 Cal.Rptr.3d 406.)

3. The Governor cited "some evidence" that Rozzo committed a crime for which the sentence is either death or life without the possibility of parole

The Governor cited evidence that Rozzo committed a willful, premeditated, and deliberate first degree murder. (See § 189 ["All murder which is perpetrated by means of ... willful, deliberate, and premeditated killing ... is murder of the first degree"].) Specifically, Rozzo's assistance in kidnapping Heggie after Talamantez had stated that the group was going "nigger hunting" constituted evidence of willfulness, premeditation and deliberation. Further, Rozzo's beating Heggie over an extended period of time, until Heggie died, constituted additional evidence that Rozzo committed a willful, premeditated, and deliberate murder.
The Governor also cited evidence that the murder was racially motivated. (§ 190.2, subd. (a)(16).) Specifically, the Governor noted that Talamantez instigated the events leading up to the murder by stating that the group was going to go "nigger hunting," and that Rozzo and other members of the group uttered racial slurs while Heggie was being kidnapped and beaten.
The Governor cited evidence that Rozzo committed murder by torture. (§ 190.2, subd. (a)(18); People v. Elliot (2005) 37 Cal.4th 453, 477, 35 Cal.Rptr.3d 759, 122 P.3d 968 ["We have construed the special circumstance, as originally enacted in 1978, as requiring proof of first degree murder, proof that the defendant intended to kill and to torture the victim, and proof of the infliction of an extremely painful act upon a living victim"].) Specifically, the Governor cited evidence that Rozzo committed an extremely brutal and lengthy beating on an unresisting victim, pushed his thumbs through the victim's Adam's apple, *70 and laughed about the killing immediately after it occurred. This constitutes some evidence of murder by torture. (See People v. Chatman (2006) 38 Cal.4th 344, 390, 42 Cal.Rptr.3d 621, 133 P.3d 534 [defendant's infliction of numerous wounds on "unresisting victim" and act of "bragging about the killing" constituted evidence of torture-murder].)
The Governor also cited evidence that the murder was committed during the course of a kidnapping. (§ 190.2, subd. (a)(17); see also People v. Weidert (1985) 39 Cal.3d 836, 842, 218 Cal.Rptr. 57, 705 P.2d 380 ["where an accused's primary goal was not to kidnap but to kill, and where a kidnap[p]ing was merely incidental to a murder but not committed to advance an independent felonious purpose, a kidnap[p]ing-felony-murder special circumstance finding cannot be sustained"].) The Governor cited evidence that Rozzo killed Heggie after having assisted in kidnapping him. There is some evidence that the kidnapping was not merely incidental to the murder. The Governor cited evidence that, after initially kidnapping Rozzo, the group considered calling the sheriff to find out whether Heggie was wanted for anything. It was only after the group discovered that no one had a dime to make the call that they made the final decision to kill Heggie.
This court considered these circumstances in rejecting Rozzo's claim on appeal that there was insufficient evidence to support his conviction for felony murder because the kidnapping was merely incidental to the murder:
"[T]he evidence concerning Rozzo's intentions was ambiguous. Rozzo's inference the kidnapping was only incidental to the murder is reasonable, but other inferences can be made from the evidence. It was reasonable for the jury to infer the intent to kidnap existed earlier and independently from the intent to kill which was formed later." (People v. Rozzo, supra, D000422.)
The same reasoning supports the conclusion that there is some evidence that the kidnapping of Heggie was not merely incidental to his murder, for purposes of determining the applicability of the kidnapmurder special circumstance.[6]
The Governor cited some evidence that the offense Rozzo committed could have constituted a first degree murder, and that three special circumstances applied: murder by torture (§ 190.2, subd. (a)(18)); racially motivated killing (§ 190.2, subd. (a)(16)); and murder committed during a kidnapping (§ 190.2, subd. (a)(17)). The penalty for first degree murder characterized by the presence of one or more special circumstances is either death, or life without the possibility of parole. (§ 190.2, subd. (a).) The Governor thus cited "some evidence" that Rozzo committed a crime that would justify a sentence of life without the possibility of parole and, in so doing, cited evidence of aggravating facts far beyond the minimum elements of Rozzo's second degree murder commitment offense. We *71 conclude that there is some evidence to support the Governor's decision finding Rozzo unsuitable for parole.[7]

4. The Governor did not violate Rozzo's right to due process by relying on the circumstances of Rozzo's commitment offense to reverse the Board's grant of parole

Rozzo raises a number of arguments in support of his claim that the Governor violated Rozzo's right to due process by relying on the circumstances of the commitment offense to reverse the Board's grant of parole. We reject each of Rozzo's contentions.
Preliminarily, we reject Rozzo's claim that the factual circumstances of his commitment offense support the conclusion that the Governor violated his right to due process. Rozzo contends in his petition that it is "reasonably doubtful" that he participated in the murder, noting that two jurors wrote postverdict letters to the trial judge in which they indicated that they did not believe Rozzo had personally committed the murder.[8] Similarly, in his denial and traverse, Rozzo states, "Respondent's notion that petitioner should have been found guilty of premeditated murder with special circumstances [citation] is absurd, particularly considering the facts that he was acquitted of premeditated murder and the jurors' statements that they found him guilty of unpremeditated second degree murder based only on an aiding [and] abetting theory because he was directly involved only in the precedent kidnapping."
The law is clear that neither the Governor nor the Board are bound by the jury's determination of the facts of the commitment offense:
"Petitioner asserts that the Governor is precluded from relying upon the foregoing circumstances [regarding the commitment offense], because at petitioner's criminal trial the jury acquitted him of first degree murder and thus necessarily found a reasonable doubt that he premeditated and deliberated the murder. Petitioner does not dispute, however, that the foregoing circumstances constitute some evidence that he engaged in premeditation and deliberation. The circumstance that the jury, for whatever reason, did not find beyond a reasonable doubt such premeditation and deliberation does not preclude the Governor from considering such evidence in exercising his discretion whether to reverse a Board decision granting parole. [Citation.] Nor does the jury's verdict in petitioner's criminal trial preclude this court from determining that some evidence supports the Governor's determination." (Rosenkrantz, supra, 29 Cal.4th at pp. 678-679, 128 Cal.Rptr.2d 104, 59 P.3d 174; Dannenberg, supra, 34 Cal.4th at pp. 1095-1096, fn. 16, 23 Cal. Rptr.3d 417, 104 P.3d 783 ["the parole authority may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction evidences"].)
It necessarily follows that neither the Governor nor the Board is required to view the facts of the offense in the light expressed by jurors in postverdict letters.
*72 We reject Rozzo's contention that "because the prison term [he] has served to date exceeds by more than three years that, prescribed by the regulations for the facts of his offense, had he been convicted of premeditated first degree murder ... [citation], those facts can no longer be used, consistent with due process, to preclude his parole." In support of this argument, Rozzo quotes Justice Moreno's concurring opinion regarding the second degree murder sentence at issue in Rosenkrantz:
"[T]here will come a point, which already may have arrived, when petitioner would have become eligible for parole if he had been convicted of first degree murder, Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a first degree murder in order to promote the parole statute's goal of proportionality between the length of sentence and the seriousness of the offense. [Citation]. Under this circumstance, the justification for denying his parole would become less clear, even under the deferential `some evidence' standard." (Rosenkrantz, supra, 29 Cal.4th at p. 690, 128 Cal.Rptr.2d 104, 59 P.3d 174 (cone. opn. by Moreno, J.).)
Even assuming that Justice Moreno's concurring opinion represents the view of the Supreme Court, in this case, as noted above, there is evidence that the offense Rozzo committed was in fact a first degree murder with special circumstances, an offense that is punishable by a sentence of life without the possibility of parole. Thus, even under Justice Moreno's view, continued incarceration of Rozzo does not violate due process, since there is some evidence that Rozzo committed an especially egregious first degree murder.
Citing In re Lee (2006) 143 Cal.App.4th 1400, 49 Cal.Rptr.3d 931 (Lee), Rozzo claims that the Governor violated his right to due process because the Governor failed to articulate a nexus between the circumstances of Rozzo's commitment offense and the risk Rozzo presently poses to public safety. In Lee, the court stated:
"The test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. [Citations.] Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (Id. at p. 1408, 49 Cal.Rptr.3d 931, fn. omitted.)
We assume for purposes of this decision that the Lee court is correct in noting that it is possible the record might contain some evidence of a factor that indicates the prisoner is not suitable for parole, and yet at the same time, not contain some evidence supporting the Governor's decision finding a prisoner to be unsuitable for parole.[9] (But see Dannenberg, supra, 34 Cal.4th at p. 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783 [stating that there was "some evidence" to support a factor indicating unsuitability and that, therefore, the Board could use that factor as a basis for finding prisoner unsuitable for parole]; Rosenkrantz, supra, 29 Cal.4th at p. 677, 128 *73 Cal.Rptr.2d 104, 59 P.3d 174 ["the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor"].)
In this case, the factor of unsuitability at issue is the circumstances of the murder, and there is some evidence that Rozzo committed acts far more egregious than those necessary to be convicted of the commitment offense of second degree murder. (Compare with Lee, supra, 143 Cal. App.4th at p. 1412, 49 Cal.Rptr.3d 931 [finding no evidence to support Governor's determination that the nature of Lee's crimes rendered him unsuitable for parole where "Lee's conduct involved no more than was necessary to commit his crimes"].) Therefore, for the reasons stated in part III.A.3., ante, under Rosenkrantz and Dannenberg, there is some evidence to support the Governor's decision to deny Rozzo parole.
Finally, Rozzo cites a number of cases in which the Courts of Appeal and federal courts have suggested that, after some lengthy period of incarceration, continued reliance solely on the circumstances of a prisoner's commitment offense to deny parole violates due process. (See e.g., In re Barker (2007) 151 Cal.App.4th 346, 374, 59 Cal.Rptr.3d 746 ["`Given the lapse of 2[9] years and the exemplary rehabilitative gains made by [Barker] over that time, continued reliance on the aggravating facts of the crime no longer amount[s] to "some evidence" supporting denial of parole'"]; In re Elkins (2006) 144 Cal.App.4th 475, 498-499, 50 Cal.Rptr.3d 503 ["Reliance on an immutable factor, without regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals espoused by the prison system, and result in a due process violation"]; Irons v. Carey (9th Cir.2007) 505 F.3d 846, 854 ["We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes"].)[10]
In addition, while this appeal was pending, the United States Court of Appeals for the Ninth Circuit decided Hayward v. Marshall (9th Cir. 2008) 512 F.3d 536 (Hayward). In Hayward, the court concluded that the governor's reversal of a grant of parole violated the defendant's federal due process rights. (Id. at 546.) The Hayward court concluded that, under the circumstances of that case, "the unchanging factor of the gravity of Hayward's commitment offense had no predictive value regarding his suitability for parole." (Ibid.) The court underscored the narrowness of its holding, emphasizing that it based its decision on the circumstances of the offense in that case:
"We emphasize that Hayward was convicted of second degree murder for stabbing a man he believed had physically assaulted his girlfriend. In concluding that Hayward's conviction offense does not, at this time, after nearly thirty years of incarceration, accurately predict that Hayward currently poses a danger to society, we do recognize that certain conviction offenses may be so `heinous, atrocious or cruel' that a prisoner's due process rights might not be violated if he or she were denied parole solely on the basis of the nature of the conviction *74 offense. We need not identify those offenses here. We confine our holding to the facts of this case and the nature of Hayward's particular conviction offense." (Id. at p. 547, fn. 10)
Neither Rosenkrantz nor Dannenberg support the proposition that a reviewing court must determine whether a commitment offense has sufficient predictive value of present dangerousness, in the context of a denial of parole. On the contrary, both Rosenkrantz and Dannenberg hold that a prisoner's due process liberty interest is not violated where the record of a denial of parole based on the circumstances of the commitment offense contains some evidence of aggravating facts beyond the minimum elements of that offense. (Rosenkrantz, supra, 29 Cal.4th at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174; Dannenberg, supra, 34 Cal.4th at pp. 1095-1096, fn. 16, 23 Cal.Rptr.3d 417, 104 P.3d 783.) We are bound by these decisions. (Auto Equity Sales, Inc. v. Superior Court, supra, 57 Cal.2d at p. 455, 20 Cal.Rptr. 321, 369 P.2d 937.)
The "beyond the minimum elements" test espoused in Rosenkrantz and Dannenberg is consistent with the basis for the due process liberty interest identified in those decisions. In Rosenkrantz, the court explained that in cases in which no circumstances of the commitment offense exceed the minimum necessary to sustain a conviction for that offense, a denial of parole based solely on those circumstances would be inconsistent with, inter alia, California's murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life, for various degrees and types of murder. (Rosenkrantz, supra, 29 Cal.4th at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.) However, in a case such as this, where there is some evidence that the prisoner committed an offense that would warrant a sentence of life without the possibility of parole, there is no violation of the proportionality based due process liberty interest in parole identified in Rosenkrantz.
Even assuming, for the sake of argument, that Rosenkrantz and Dannenberg do not foreclose Rozzo's claim insofar as his claim is premised on the federal constitution, and assuming further that we were to follow Hayward, we still would conclude that the governor's decision did not violate Rozzo's federal due process rights. Rozzo's offense is in no way comparable to the offense discussed in Hayward. The killing in which Rozzo participated was entirely unprovoked and was particularly heinous, atrocious and cruel for the reasons stated in part III.A.,3., ante.

B. Rozzo has not demonstrated that the Governor failed to provide proper individualized consideration of his case, thus violating Rozzo's right to due process

Rozzo claims that the Governor violated his right to due process because the Governor did not personally review his case. Rozzo further contends that the Governor failed to provide individualized consideration of Rozzo's case because the Governor relied on the commitment offense as the basis for reversing the grant of parole. Rozzo notes that the Governor has done this in all cases in which he has reversed the Board's grant of parole. Rozzo also claims that the Governor routinely fails to apply the preponderance of the evidence standard in rendering his decisions, and that he did so in this case.
Evidence Code section 664 provides, "It is presumed that official duty has been regularly performed." "Although this presumption is disputable [citation], it may not be disputed by proof that the [official] trained personnel advised and assisted the [official] (by drafting a proposed *75 decision or otherwise) if the [official] ... makes the actual decision." (Board of Administration v. Superior Court (1975) 50 Cal.App.3d 314, 320, 123 Cal.Rptr. 530.) "Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to plead sufficient grounds for relief, and then later to prove them." (People v. Duvall (1995) 9 Cal.4th 464, 474, 37 Cal. Rptr.2d 259, 886 P.2d 1252.)
The Governor signed a three and one-half page statement of reasons explaining the basis for his reversal of the Board's decision in this case. The Governor's statement contains a discussion of the particular facts of Rozzo's offense, and outlines Rozzo's criminal history, his behavior in prison, his plans for parole, and his feelings about the offense. The Governor's statement of reasons detailing Rozzo's individual case constitutes evidence that Rozzo received individualized consideration of his case, and Rozzo has not presented any evidence that the Governor did not make the final decision in this case. Even assuming that the Governor routinely relies on a prisoner's commitment offense to reverse grants of parole, this would not prove that the Governor failed to give Rozzo's case individualized consideration. Further, assuming that the preponderance of the evidence standard applies to the Governor's decision regarding a prisoner's suitability for parole, Rozzo has not presented any evidence that the Governor failed to apply this standard in reaching his decision.
Accordingly, we conclude that Rozzo has failed to establish that the Governor did not provide proper individualized consideration of his case.

C. Rozzo has not demonstrated that the Governor has adopted an anti-parole policy for murderers

Rozzo claims that the Governor applies an anti-parole policy to persons convicted of murder, and that this policy violates Rozzo's constitutional right to due process. In Rosenkrantz, the petitioner raised a similar claim and presented evidence that in the period between January 1999 through April 2001, former Governor Davis reversed 47 of 48 decisions in which the Board granted parole. (Rosenkrantz, supra, 29 Cal.4th at p. 685, 128 Cal. Rptr.2d 104, 59 P.3d 174.) The Rosenkrantz court rejected the petitioner's claim, reasoning, "As the Governor contends, the circumstance that the Governor has permitted the parole of two[11] persons convicted of murder is inconsistent with the conclusion that he has adopted a blanket policy of denying parole to all murderers." (Rosenkrantz, supra, 29 Cal.4th at p. 685, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
Rozzo asserts that the current Governor has reversed approximately 72 percent of parole dates granted in murder cases. Assuming for the sake of argument that Rozzo's statistics are correct, Rozzo's evidence of an anti-parole policy is much weaker than the argument the Rosenkrantz court rejected. Accordingly, we conclude that Rozzo has failed to establish that the Governor has adopted an anti-parole policy that violates Rozzo's right to due process.

D. The composition of the Board did not violate Rozzo's right to due process

Rozzo claims that the composition of the Board "insures bias and fundamental unfairness, and violates petitioner's liberty *76 interest and right to due process vested by the State's parole laws and by the Due Process Clauses." Rozzo contends that the current Governor, and former governors, have appointed, almost exclusively, former law enforcement personnel, anti-parole legislators, and victim advocates to the Board. Rozzo claims that the governors' exercise of their appointment powers in such a fashion is contrary to section 5075. That section provides:
"The selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross section of the racial, sexual, economic, and geographic features of the population of the state." (§ 5075, subd. (b).)
Rozzo also claims that the Board lacks socio-economic and geographic diversity. Assuming for the sake of argument that Rozzo's description of the composition of the Board is true, Rozzo fails to present any authority that suggests that individual prisoners have a due process right to any particular composition of the Board. Further, even assuming that the composition of the Board violated Rozzo's right to due process, Rozzo has failed to explain how he suffered any prejudice from such a violation in this case, since the Board found him suitable for parole. Accordingly, we reject Rozzo's claim.

IV.

DISPOSITION
The petition is denied.
WE CONCUR: McCONNELL, P.J., and McINTYRE, J.
NOTES
[1] Rozzo's counsel registered no objection to this summary. The Board asked whether Rozzo had any objection to the Board incorporating by reference the statement of facts taken from this court's decision in Rozzo's direct appeal in this case. (See People v. Rozzo (July 2, 1984, D000422) [nonpub. opn.].) Rozzo's counsel stated that he had no objection.
[2] All statutory references are to the Penal Code unless otherwise stated.
[3] The transcript of the panel's decision provides, "Because of mature maturation he has a greater understanding of advancing age he has reduced his probability of recidivism." We interpret this statement as set forth in the text.
[4] Although not specifically referenced in the Board panel's summary of the facts presented at Rozzo's 2005 suitability hearing, the record before the Board panel contained evidence that Talamantez instigated Heggie's abduction by telling the group that they were going to go "nigger hunting."
[5] Title 15, section 2402, of the California Code of Regulations provides:

"(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
"(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safety be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.
"(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
"(1) [Circumstances surrounding the commitment offense as quoted in the text.] [¶] ... [¶]
"(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at art early age.
"(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
"(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
"(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
"(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.
"(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:
"(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
"(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.
"(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
"(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.
"(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
"(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.
"(7) Age. The prisoner's present age reduces the probability of recidivism.
"(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
"(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."
[6] In the wake of a 1998 amendment to the special circumstances law (Stats. 1998, ch. 629, § 2 (Prop. 18, approved Mar. 7, 2000, eff. Mar. 8, 2000)), a kidnapping felony murder special circumstance may be sustained even where the kidnapping is incidental to the murder. (§ 190.2, subd. (a)(17)(M) ["(M) To prove the special circumstances of kidnapping in subparagraph (B), or arson in subparagraph (H), if there is specific intent to kill, it is only required that there be proof of the elements of those felonies. If so established, those two special circumstances are proven even if the felony of kidnapping or arson is committed primarily or solely for the purpose of facilitating the murder"].) We need not, and do not, rely on this amendment in light of our conclusion that there is some evidence that the kidnapping of Heggie was not incidental to his murder.
[7] In his statement of reasons, the Governor stated that the commitment offense, alone, was a sufficient ground on which to deny Rozzo parole. In light of our conclusion that there is some evidence to support this ground, we need not consider whether there is some evidence to support the Governor's other grounds for reversing the Board's decision.
[8] One of the letters states, "First of all, not one juror felt that Mr. Rozzo participated in the actual murder of Mr. Heggie."
[9] The Lee court offered the following as an example of such an instance:

"For example, a seriously troubled adolescence, even for an 80-year-old inmate, might constitute `some evidence' of `a history of unstable or tumultuous relationships with others.' (Cal.Code Regs., tit. 15, § 2402, subd. (c)(3).) It would not necessarily be some evidence of an unreasonable danger to public safety." (Lee, supra, 143 Cal.App.4th at p. 1408, 49 Cal.Rptr.3d 931.)
[10] The question whether there may come a point in time after a lengthy period of incarceration at which the gravity of the prisoner's commitment offense may be insufficient to deny parole is pending before our Supreme Court. (See In re Lawrence 150 Cal.App.4th 1511, 59 Cal.Rptr.3d 537, review granted Sept. 19, 2007, S154018.)
[11] The Rosenkrantz court noted that former Governor Davis upheld an additional parole grant in the period between April 2001 and April 2002. (Rosenkrantz, supra, 29 Cal.4th at p. 685, 128 Cal.Rptr.2d 104, 59 P.3d 174.)