[No. D049704. Fourth Dist., Div. One. Mar. 16, 2009.]

In re JOSEPH ROZZO on Habeas Corpus.

**COUNSEL**

Roger S. Hanson for Petitioner Joseph Rozzo.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Linnea D. Piazza, Deputy Attorneys General, for Respondent the People.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

Joseph Rozzo murdered Richard Heggie in 1980. In 1982, a jury found Rozzo guilty of second degree murder, and he is currently serving a sentence of 16 years to life. Rozzo filed this petition for writ of habeas corpus challenging the Governor's reversal of a decision of the Board of Parole Hearings (Board) granting Rozzo parole. Rozzo's primary claim is that the Governor's decision violates his right to due process because there is not sufficient evidentiary support for the decision.

In our initial opinion in this matter, we concluded that there was sufficient evidence to support the Governor's decision. (*In re Rozzo* (2008) 159

Cal.App.4th 1089, 1106 [72 Cal.Rptr.3d 58].) We rejected the remainder of Rozzo's claims and denied the petition. (*Id.* at pp. 1110–1113.) The Supreme Court granted Rozzo's petition for review (*In re Rozzo*, review granted May 14, 2008, S161469), and subsequently issued two companion decisions, *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*) and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*), in which the court clarified the law governing judicial review of parole decisions. The Supreme Court then transferred Rozzo's case back to this court with directions to vacate our earlier decision and reconsider the case in light of *Lawrence* and *Shaputis*.

We now vacate our prior decision and reconsider the matter, as directed by the Supreme Court. Upon reconsideration, we again conclude that there is sufficient evidence to support the Governor's decision, and reject the remainder of Rozzo's claims. Accordingly, we deny the petition.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. *The commitment offense*

At Rozzo's November 2005 parole suitability hearing before a panel of the Board, the presiding commissioner recited the following summary of the facts of Rozzo's commitment offense into the record:[1]

"On July 30, 1980[,] at approximately 9:30 a.m.[,] a motorist driving on [H]ighway 79 near [Warner] Springs California discovered the body of Richard Heggie. . . . [A] sheriff[']s deputy was summoned and upon arrival determined the victim was dead. The sheriff[] observed signs of a scuffle near the body [and] the coroner determined that Heggie had deep abrasions in the front throat area and both left and right sides of his neck. The abrasions were inflicted on a downward slant as though caused by fingernails. Numerous other bruises were presented on the victim[']s temple, eyebrow, cheekbones, and on the left side of the torso and chest. Small amounts of blood [were] oozing from the victim[']s mouth. An autopsy [was performed and] the coroner discovered blood in the chest cavity and [a] large . . . hematoma on the right temple area of the victim's head. The throat was noted to have a crushed larynx, and a broken neck. The cause of death was [c]ited as substantial injuries to the neck and head areas.

---

[1] Rozzo's counsel registered no objection to this summary. The Board asked whether Rozzo had any objection to the Board incorporating by reference the statement of facts taken from this court's decision in Rozzo's direct appeal in this case. (See *People v. Rozzo* (July 2, 1984, D000422) [nonpub. opn.].) Rozzo's counsel stated that he had no objection.

"A subsequent investigation revealed that on July 29, 1980, Joseph Rozzo, Ronald Talamantez, Kenneth Jorman, Glenn Duro, John Cassell, and other individuals were driving to an Indian reservation when they observed a [B]lack man[,] Rich Heggie[,] walking on the side of the road. . . . [Rozzo and other members of the group began] beating him with their fists and making racially derogatory statements. Heggie was then thrown in the back of the truck and continued to be beaten by his assailants. Heggie apparently did not actively resist the beating but plead[ed] to be left alone. [Heggie] was then removed from the truck bed and forced into the tru[n]k of one of the other vehicles. The group took Heggie to a turnaround along the side of the road.

"Removing [Heggie] from the tru[n]k [the group] . . . continued beating him. Rozzo and Talamantez hit and kicked the victim repeatedly while saying, "you are going to die now nigger." Heggie screamed while the beating continued, begging them to let him go and not to kill him. Talamantez and Rozzo ceased beating him and drank beer while Heggie crawled into a ditch. They [Talamantez and Rozzo] followed [Heggie] and proceeded to beat him again. Upon returning to the truck Rozzo and Talamantez told the group that Heggie was dead. Rozzo stated that he [wa]s sure [that Heggie was dead] because [Rozzo] shoved [his] thumb into [Heggie's] [A]dam[']s apple and it burst."

## B. *Rozzo's jury trial, conviction, and appeal*

Rozzo was charged with first degree murder and three special circumstances: murder by torture (Pen. Code,[2] § 190.2, subd. (a)(18)); racially motivated killing (§ 190.2, subd. (a)(16)); and murder committed during a kidnapping (§ 190.2, subd. (a)(17)). The jury found Rozzo guilty of second degree felony murder, with kidnapping as the underlying felony. On appeal, this court affirmed Rozzo's conviction. (*People v. Rozzo, supra,* D000422.) In a concurring opinion, Justice Staniforth stated the following, "The evidence here warrants a first degree (premeditated or torture) murder finding. I concur in a second degree holding only because I know of no way to raise—even on a retrial—the degree of guilt to first degree murder." (*People v. Rozzo, supra,* D000422 (conc. opn. of Staniforth, J.).)

## C. *Rozzo's parole suitability hearings*

In 1990, Rozzo attended his first parole suitability hearing. Hearings were subsequently held on nearly a yearly basis. In all hearings prior to 2005, Board panels determined that Rozzo was unsuitable for parole. A Board panel

---

[2] All subsequent statutory references are to the Penal Code unless otherwise stated.

held an 11th parole suitability hearing for Rozzo in November 2005. At the conclusion of that hearing, the panel determined that Rozzo was suitable for parole, concluding that he would no longer pose an unreasonable risk to society or a threat to public safety if released from prison.

In support of its decision, the Board panel noted that Rozzo had no juvenile record nor any record of assaulting others while in prison. In addition, Rozzo has enhanced his ability to function within the law by participating in educational programs, and has received his GED. Further, Rozzo has been involved in self-help programs and vocational programming while in prison. Rozzo has received excellent job performance ratings. The panel also stated that because of maturation and his advanced age, Rozzo has a reduced probability of recidivism.[3] The Board affirmed the panel's decision in March 2006.

### D. *The Governor's reversal of the Board's grant of parole*

In March 2006, the Governor reversed the Board's decision to grant Rozzo parole. In his accompanying statement of reasons, the Governor described the circumstances of the murder in a manner similar to the description in part II.A., *ante*. In evaluating these circumstances, the Governor agreed with Justice Staniforth's observation that the evidence warranted a first degree murder finding with premeditation or torture. The Governor stated that he agreed with the statement made by a commissioner in Rozzo's 2002 parole hearing that, relative to other cases involving second degree murder, Rozzo's offense was " 'the worst one, or one of the worst ones we've ever seen.' " The Governor further stated: "The facts of this crime—Mr. Talamantez's suggestion that the group go 'hunting,'[4] the prolonged and horrific beating inflicted by Mr. Rozzo and his crime partner, and the racial slurs used by both men during the attack—go well beyond that required to sustain a second-degree murder conviction. The gravity of this shocking crime alone is sufficient for me to conclude that Mr. Rozzo's release from prison would pose an unreasonable public-safety risk."

In addition to his description of the murder, the Governor detailed Rozzo's criminal history prior to the murder as follows: "Mr. Rozzo was 30-years-old at the time of the offense, and has an adult criminal history that escalated in

---

[3] The transcript of the panel's decision provides, "Because of mature maturation he has a greater understanding of advancing age he has reduced his probability of recidivism." We interpret this statement as set forth in the text.

[4] Although not specifically referenced in the Board panel's summary of the facts presented at Rozzo's 2005 suitability hearing, the record before the Board panel contained evidence that Talamantez instigated Heggie's abduction by telling the group that they were going to go "nigger hunting."

severity. In November of 1969 he was arrested for disturbing the peace and received a 30-day suspended sentence and one year of probation. In 1971 he was arrested for possession of marijuana for sale in July and sentenced to 180 days in jail and 36 months of formal probation; according to him, he violated probation by participating in a robbery, and was sent to prison. In October of 1971 he was arrested for possession of marijuana and sentenced to one year of probation. In 1973 he was arrested for possession of dangerous drugs in February and possession of drug paraphernalia in September; neither arrest led to a conviction. In February of 1974 he was arrested for robbing an avocado orchard owner with a sawed-off shotgun and was found guilty of second-degree robbery and was sentenced to one year-to-life in prison plus a concurrent sentence of two-to-ten years for violating probation; he served two years and was paroled, but he violated his parole and was sent back to state prison. In 1976 he was arrested for petty theft in January, violating parole in July for which he was sentenced to four days in jail, and misdemeanor hit and run in December for which he was sentenced to 30 days in jail." The Governor determined that "Rozzo's history of serious criminal misconduct weighs against parole suitability."

The Governor also noted that Rozzo had been disciplined four times for various prison rules violations, including falsifying state documents, attempting to introduce contraband into his unit, possessing dangerous contraband in his cell, and refusing to submit to a urinalysis. The Governor noted that Rozzo had remained discipline free for 20 years and found this fact "encouraging," but stated, "nevertheless [Rozzo] engaged in serious misconduct in prison."

The Governor also stated that "Rozzo . . . has demonstrated a growing sense of remorse for his crime, as he initially told the probation officer that he was innocent . . . yet in 2002 attempted to send a letter to Mr. Heggie's family describing how sorry he was for his involvement in the crime." In addition, the Governor noted, "during his 2004 mental health evaluation [Rozzo] stated that he committed 'a terrible crime' and could not express how deeply sorry he was." However, the Governor stated that Rozzo continued to blame his commission of the crime on his consumption of alcohol and to deny that the crime had been racially motivated. The Governor noted that Rozzo stated during the 2005 parole hearing that the crime would not have happened if he had not been under the influence of alcohol.

During Rozzo's 2005 parole hearing, the deputy district attorney requested that the commissioners ask Rozzo whether the murder had been racially motivated. Thereafter, the following colloquy occurred:

"[Commissioner]: Was this a[] racially motivated offense?

"[Rozzo's counsel]: I am sorry that gets into the fact[s] Commissioner.

"[Commissioner]: He asked the question I am only asking Mr. Rozzo. You don't wish to answer the question?

"[Rozzo's counsel]: I think he took his right to not speak about the crime today, thank you Commissioner."

"[Deputy district attorney]: So my question[] cannot be answered."

Although the Governor did not specifically refer to this exchange in his statement of reasons, the Governor concluded that Rozzo "still seems to lack insight into why he committed such a terrible crime."

The Governor also considered factors that supported a grant of parole. The Governor noted that while incarcerated, Rozzo had earned a GED, became highly skilled in welding, held numerous jobs within the prison, and participated in an array of self-improvement groups. The Governor noted that Rozzo had received numerous commendations for his performance in various prison jobs and his participation in self-help programs. The Governor stated that these factors supported Rozzo's release from prison, and also noted that Rozzo had made "realistic, confirmed plans upon parole."

The Governor concluded by stating, "[T]he especially grave and atrocious crime committed by Mr. Rozzo, his history of misconduct both inside and outside of prison, and his lack of insight into why he committed the crime presently outweigh[] the factors tending to support his parole suitability." The Governor continued, "The gravity of this shocking crime alone is sufficient for me to conclude that Mr. Rozzo's release from prison would pose an unreasonable public-safety risk."

E. *Rozzo's petitions for habeas corpus*

Rozzo filed a petition for habeas corpus in the trial court. In his petition, Rozzo claimed that the record did not support the Governor's decision. The trial court commented that the murder had been "racially motivated" and that it "was prolonged and involved torture and a callous disregard for the victim's suffering." The court determined that there was "some evidence" to support the Governor's decision and denied the petition.

Rozzo subsequently filed this petition for writ of habeas corpus in this court.

## III.

## DISCUSSION

A. *There is some evidence to support the Governor's decision finding Rozzo unsuitable for parole*

Rozzo claims that the Governor's reversal of the Board's decision violates his right to due process because it is "supported by no evidence whatsoever." We disagree.

### 1. *Standard of review*

In *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*), the Supreme Court held that prisoners in California have a liberty interest in parole suitability decisions and that this interest is protected by due process of law, as embodied in the state Constitution. (29 Cal.4th at pp. 655, 658, fn. 12.) The *Rosenkrantz* court further held that due process requires that there be "some evidence" in the record before the Board that supports a decision by the Board to deny parole or a governor's decision to reverse a grant of parole. (*Id.* at pp. 652, 664, 667.) The *Rosenkrantz* court characterized this standard as "extremely deferential." (*Id.* at p. 665.)

In *Lawrence, supra*, 44 Cal.4th 1181, the Supreme Court reaffirmed "that the decisions of both the Board and the Governor are entitled to deference." (*Id.* at p. 1191, fn. 2.) However, the *Lawrence* court clarified that "when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Id.* at p. 1212.) Thus, the "mere existence of a regulatory factor establishing unsuitability does not necessarily constitute 'some evidence' that the parolee's release unreasonably endangers public safety." (*Id.* at p. 1225.)[5]

### 2. *Governing law*

a. *The statutes governing suitability for parole of prisoners who are serving indeterminate life sentences*

Section 3041, subdivision (a) provides in relevant part, "One year prior to the inmate's minimum eligible parole release date a panel of two or more

---

[5] Rozzo does not contend that his federal constitutional right to due process provides him with a more favorable standard of review than does his state constitutional right to due process as interpreted in *Rosenkrantz* and its progeny.

commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5." Section 3041, subdivision (b) provides in relevant part, "The panel or the board, sitting en banc, shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

 b. *The Board's regulations concerning prisoner suitability for parole*

 Title 15, section 2402, of the California Code of Regulations outlines the manner by which the Board is to determine whether a prisoner such as Rozzo is suitable for parole.[6] Subdivision (c) of that section provides a nonexclusive list of "Circumstances Tending to Show Unsuitability." Included among these circumstances are the following pertaining to the commitment offense:

---

 [6] Title 15, section 2402, of the California Code of Regulations provides:

 "(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

 "(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

 "(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

 "(1) [Circumstances surrounding the commitment offense as quoted in the text.] [¶] . . . [¶]

 "(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

 "(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

 "(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

 "(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

 "(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

 "(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general

"(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

"(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

"(C) The victim was abused, defiled or mutilated during or after the offense.

"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

"(E) The motive for the crime is inexplicable or very trivial in relation to the offense." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

### c. *The Governor's power to review the Board's decision*

Article V, section 8, subdivision (b) of the California Constitution provides in relevant part: "No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the

---

guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

"(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

"(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

"(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

"(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

"(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

"(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

"(7) Age. The prisoner's present age reduces the probability of recidivism.

"(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

"(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."

decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider."

Section 3041.2 specifies the manner by which the Governor may exercise his constitutional power of review of the Board's decision:

"(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority.

"(b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision."

### d. Case law

In *Rosenkrantz*, the Supreme Court held that "[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. [Citations.]" (*Rosenkrantz, supra,* 29 Cal.4th at p. 682.) However, the *Rosenkrantz* court acknowledged that in some situations, a decision denying a prisoner parole solely on the basis of the circumstances of his commitment offense might violate due process: "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. . . .' (Pen. Code, § 3041, subd. (a).) 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.) [¶] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.' [Citation.]" (*Id.* at p. 683.)

In *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*), the Supreme Court returned to the issue of the circumstances under which a denial of parole based solely on the nature of a prisoner's commitment offense might violate due process. The *Dannenberg* court stated, "When the Board bases unsuitability on the circumstances of the commitment offense, it must cite 'some evidence' of aggravating facts *beyond the minimum elements of that offense. (Rosenkrantz, supra,* 29 Cal.4th 616, 658, 683.)" (*Dannenberg, supra,* 34 Cal.4th at pp. 1095–1096, fn. 16.) The *Dannenberg* court clarified that, "[o]ur use of the phrase 'particularly egregious,' [in *Rosenkrantz*] conveyed only that the violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." (*Dannenberg, supra,* 34 Cal.4th at p. 1095, quoting *Rosenkrantz, supra,* 29 Cal.4th at p. 683.)

More recently, in *Lawrence,* the Supreme Court stated, "[T]o the extent our decisions in *Rosenkrantz* and *Dannenberg* have been read to imply that a particularly egregious commitment offense *always* will provide the requisite modicum of evidence supporting the Board's or the Governor's decision, this assumption is inconsistent with the statutory mandate that the Board and the Governor consider all relevant statutory factors when evaluating an inmate's suitability for parole, and inconsistent with the inmate's due process liberty interest in parole that we recognized in *Rosenkrantz.* [Citation.]" (*Lawrence, supra,* 44 Cal.4th at p. 1191.) The *Lawrence* court reasoned, "A survey of the appellate court decisions reveals . . . that the minimum elements inquiry is unworkable in practice, not merely because it has led courts to engage in comparative analysis or to characterize clearly aggravated conduct as not particularly egregious, but also because it has become evident that there are few, if any, murders that could *not* be characterized as either particularly aggravated, or as involving some act beyond the minimum required for conviction of the offense." (*Id.* at p. 1218.)

Thus, in the wake of *Lawrence,* it is clear that the fact that a prisoner's commitment offense involved an act that exceeds the minimum required for conviction is not a sufficient basis for affirming a Governor's reversal of a grant of parole. (*Lawrence, supra,* 44 Cal.4th at p. 1221 ["the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor"].) Rather, there must be "something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, [that] indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Id.* at p. 1214.)

In *Lawrence*, the prisoner had murdered her former lover's wife. (*Lawrence, supra*, 44 Cal.4th at p. 1190.) Lawrence committed the murder shortly after she learned that her lover was reneging on a promise to leave his wife. (*Id.* at p. 1193.) Lawrence became enraged, armed herself with a gun and a potato peeler, and shot and stabbed the victim, causing her death. (*Ibid.*) In describing Lawrence's mental state at the time of the commitment offense, the Supreme Court stated that the Board had reasonably concluded that "petitioner committed this crime while she was experiencing an unusual amount of stress arising from circumstances not likely to recur . . . ." (*Id.* at p. 1226.)

Prior to her murder conviction, Lawrence had no criminal record. (*Lawrence, supra*, 44 Cal.4th at p. 1193.) In addition, during the 23 years in which she was incarcerated for the murder, Lawrence remained "free of serious discipline . . . ." (*Id.* at p. 1194.) She received numerous positive psychological assessments, engaged in "extraordinary rehabilitative efforts specifically tailored to address the circumstances that led to her criminality," demonstrated "insight into her past criminal behavior," showed "expressions of remorse," and made "realistic parole plans . . . ." (*Id.* at p. 1226.)

Applying its refined "some evidence" standard to these facts, the *Lawrence* court concluded: "In some cases, such as this one, in which evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1191, italics omitted.)

█ Notwithstanding its conclusion that the circumstances of Lawrence's crime did not remain a valid indicator of her current dangerousness, the *Lawrence* court emphasized that, under certain circumstances, an inmate's offense might continue to provide evidence of his or her unsuitability for parole: "[C]ertain conviction offenses may be so 'heinous, atrocious or cruel' that an inmate's due process rights would not be violated if he or she were to be denied parole on the basis that the gravity of the conviction offense establishes current dangerousness. In some cases, such as those in which the inmate has failed to make efforts toward rehabilitation, has continued to engage in criminal conduct postincarceration, or has shown a lack of insight or remorse, the aggravated circumstances of the commitment offense may well continue to provide 'some evidence' of current dangerousness even decades after commission of the offense." (*Lawrence, supra*, 44 Cal.4th at p. 1228.)

The *Lawrence* court explained, "[W]here the record also contains evidence demonstrating that the inmate lacks insight into his or her commitment offense or previous acts of violence, even after rehabilitative programming tailored to addressing the issues that led to commission of the offense, the aggravated circumstances of the crime reliably may continue to predict current dangerousness even after many years of incarceration." (*Lawrence, supra* 44 Cal.4th at p. 1228, citing *Shaputis, supra*, 44 Cal.4th 1241; *In re Hyde* (2007) 154 Cal.App.4th 1200, 1215 [65 Cal.Rptr.3d 162] (*Hyde*); *In re Tripp* (2007) 150 Cal.App.4th 306, 314, 320 [58 Cal.Rptr.3d 64] (*Tripp*).)

In *Hyde*, the prisoner committed multiple robberies in the early 1970's. During one of the robberies, Hyde murdered an elderly man, and, in another robbery, Hyde shot an unresisting victim in the leg and torso. (*Hyde, supra*, 154 Cal.App.4th at p. 1215.) In 1990, while in prison, Hyde possessed a handmade dirk or dagger. (*Id.* at p. 1216.) However, Hyde was only 18 years old at the time he committed the robberies and the murder. He had been free of even minor disciplinary actions in prison since 1995, obtained 60 units of college credit while incarcerated, pursued various vocational opportunities in prison, and attended all self-help programs that were available to him in prison. Notwithstanding this record of rehabilitation, the *Hyde* court concluded that " 'some evidence' " supported the Board's determination that Hyde was unsuitable for parole. (*Ibid.*) The *Hyde* court reasoned, "Hyde's crimes are collectively so grave that we cannot find their remoteness has resulted in a loss of reliability as predictors of future dangerousness." (*Ibid.*)

In *Tripp*, the Governor based his denial of parole "entirely on the commitment offense." (*Tripp, supra*, 150 Cal.App.4th at p. 314.) According to the Governor, Tripp helped plan the kidnapping and murder of a 10-year-old child to obtain money and to help an accused child molester avoid prosecution. (*Id.* at pp. 314–315.) The *Tripp* court acknowledged that Tripp had made considerable rehabilitative efforts during her 23 years in prison, including participating in numerous therapeutic and educational programs, staying discipline free for more than 16 years, and establishing solid relationships with her mother and daughter. In addition, Tripp had viable parole plans. (*Id.* at pp. 314, 320.) The *Tripp* court noted that the Governor had not overlooked these facts, which suggested suitability, and stated that Tripp's "real disagreement is with the weight [the Governor] attached in 2004 to her 1979 behavior [in helping plan the kidnap/murder]." (*Id.* at p. 320.) In denying Tripp's petition for habeas corpus, the *Tripp* court concluded, "[W]e cannot say that due process required the Governor to strike a different balance." (*Ibid.*)

In *Shaputis*, which was released on the same day as *Lawrence*, the Supreme Court concluded that "some evidence" supported the Governor's conclusion that the prisoner was unsuitable for parole in light of the gravity

of the second degree murder he committed, his lack of insight into the offense, and his failure to accept responsibility for his actions. (*Shaputis, supra,* 44 Cal.4th at p. 1246.) With respect to the circumstances of the offense, the record contained evidence that Shaputis intentionally killed his wife by shooting her in the neck with a gun, at close range. (*Id.* at p. 1248.) There was evidence that Shaputis had been "drinking heavily" on the night of the murder, and that he was "a problem drinker with a history of violence when drunk." (*Id.* at p. 1247.) Although the commitment offense was Shaputis's first felony conviction, he had a "long and sometimes violent criminal history" (*id.* at p. 1248), and had perpetrated both physical and sexual abuse upon various family members (*id.* at pp. 1246–1248).

Shaputis acknowledged that his conduct in killing his wife was " 'wrong,' " and the Supreme Court noted that the record contained evidence that Shaputis felt "some remorse" for the crime. (*Shaputis, supra,* 44 Cal.4th at p. 1260.) However, Shaputis maintained throughout several parole proceedings that the shooting had been an accident. (*Id.* at pp. 1249–1250.) During Shaputis's most recent parole hearing, when asked whether he had a problem in the way in which he treated women, Shaputis responded, " 'Well, no I don't. I don't know how to say that I don't have a problem now. I didn't have a—I guess I had a problem then but I don't know how to put it into pictures or words. I just—It was one of those things I didn't quite understand, I guess. Not having a thorough idea of how stupid I was being, how dumb I was being.' " (*Id.* at p. 1252.) Psychological reports prepared in connection with Shaputis's parole proceedings generally concluded that he presented a low risk for violence if paroled, absent a relapse into alcoholism. (*Ibid.*) However, the reports also noted that Shaputis demonstrated a lack of insight into his prior behavior and that he appeared to have limited interpersonal skills. (*Ibid.*)

Notwithstanding that Shaputis was 71 years old and in poor health, that he had been in prison for more than 20 years, had amassed an excellent work and discipline-free record while in prison, and had participated in numerous rehabilitative programs related to the circumstances that led to his criminality, the Supreme Court concluded that this court had erred in reversing the Governor's decision that Shaputis was unsuitable for parole. (*Shaputis, supra,* 44 Cal.4th at pp. 1245–1246, 1249.) In holding that the circumstances of Shaputis's murder remained probative to a determination of his suitability for parole, the Supreme Court distinguished Shaputis's case from *Lawrence*: "The record supports the Governor's determination that the crime was especially aggravated *and,* importantly, that the aggravated nature of the offense indicates that petitioner poses a current risk to public safety. This is not a case, like *Lawrence, supra,* 44 Cal.4th 1181, 1225, in which the commitment offense was an isolated incident, committed while petitioner was subject to emotional stress that was unusual or unlikely to recur. (See, e.g.,

[Cal. Code] Regs., § 2402, subd. (d)(4) [the circumstance that the crime was committed during a period of significant stress in an inmate's life constitutes evidence to be considered in evaluating his or her suitability for parole].) Instead, the murder was the culmination of many years of petitioner's violent and brutalizing behavior toward the victim, his children, and his previous wife." (*Shaputis, supra*, 44 Cal.4th at p. 1259.)

The Supreme Court also stressed that Shaputis's lack of insight into the reasons for the murder also supported the Governor's conclusion that Shaputis remained unsuitable for parole: "Evidence concerning the nature of the weapon, the location of ammunition found at the crime scene, and petitioner's statement that he had a 'little fight' with his wife support the view that he killed his wife intentionally, but as the record also demonstrates, petitioner *still* claims the shooting was an *accident*. This claim, considered with evidence of petitioner's history of domestic abuse and recent psychological reports reflecting that his character remains unchanged and that he is unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative 'programming,' [fn. omitted] all provide some evidence in support of the Governor's conclusion that petitioner remains dangerous and is unsuitable for parole. [Fn. omitted.]" (*Shaputis, supra*, 44 Cal.4th at p. 1260.)

### 3. *The Governor cited "some evidence" that Rozzo remains unsuitable for parole in that he poses a current threat to public safety*

As noted in part II.D., *ante*, the Governor noted that a number of facts in the record supported granting Rozzo parole. Rozzo has availed himself of educational, vocational, and therapeutic opportunities in prison. The Governor also noted that Rozzo has shown an increasing sense of remorse for his crime. In addition, Rozzo has made realistic and viable plans for life outside of prison, in the event that he is paroled. However, the Governor noted that the circumstances of the murder, Rozzo's misconduct inside and outside of prison, and Rozzo's lack of insight into why he committed the murder, support the conclusion that Rozzo is unsuitable for parole.

In this proceeding, in determining whether "some evidence" supports the Governor's decision that Rozzo is unsuitable for parole, we are mindful of the *Lawrence* court's observation that "[i]t is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Lawrence, supra*, 44 Cal.4th at p. 1212.) Further, in light of *Lawrence* and *Shaputis*, in considering the circumstances of the offense, rather than focusing on whether Rozzo committed acts that exceed the elements of second degree murder, we

consider whether the record supports the Governor's determination that the crime was especially aggravated *and* that the aggravated nature of the offense indicates that Rozzo poses a current risk to public safety. (*Lawrence, supra*, 44 Cal.4th at p. 1228; *Shaputis, supra*, 44 Cal.4th at p. 1259.)

There can be little doubt that the record contains evidence that Rozzo committed an especially aggravated offense. Indeed, notwithstanding that the jury found Rozzo guilty of only second degree murder, the Governor cited evidence that Rozzo committed a willful, premeditated, and deliberate first degree murder (§ 189) with special circumstances that include murder by torture (§ 190.2, subd. (a)(18)) and racially motivated killing (§ 190.2, subd. (a)(16)).[7] Specifically, with respect to first degree murder, Rozzo's kidnapping of Heggie, beating him in multiple locations, and killing Heggie after Heggie pled for his life, constituted evidence of willfulness, premeditation and deliberation. As the Governor observed, the fact that Talamantez instigated the events leading up to the murder by stating that the group was going to go "nigger hunting," and that Rozzo and other members of the group uttered racial slurs while Heggie was being kidnapped and beaten, constitutes evidence that the murder was racially motivated. Evidence that the Governor cited showing that Rozzo committed an extremely brutal and lengthy beating on an unresisting victim, pushed his thumbs through the victim's Adam's apple, and laughed about the killing immediately after it occurred, constitutes evidence of murder by torture. (See *People v. Chatman* (2006) 38 Cal.4th 344, 390 [42 Cal.Rptr.3d 621, 133 P.3d 534] [defendant's infliction of numerous wounds on "unresisting victim" and act of "bragging about the killing" constituted evidence of torture murder].)

Further, the apparent motivation for Heggie's murder—racial hatred, and the manner in which Rozzo perpetrated the murder—with a mob against an unresisting and helpless victim, suggest that the circumstances of the commitment offense "continue to be probative of [Rozzo's] dangerousness . . . ." (*Lawrence, supra*, 44 Cal.4th at p. 1219; see *In re Van Houten* (2004) 116 Cal.App.4th 339, 356 [10 Cal.Rptr.3d 406] ["[Petitioner's] murders were not as if she had murdered people whom she knew and had given her a once-in-a-lifetime motive to kill as in *Rosenkrantz*—she just went along with the other Family members to murder whomever they haphazardly picked to sacrifice to their evil apocalyptic fantasies. No one can convincingly say with certainty that, having done that once, she will never do it again."].) As was true in *Hyde* and *Tripp*, both of which the Supreme Court cited favorably on

---

[7] The law is clear that the Governor is not bound by the jury's determination of facts in determining the circumstances of the offense. (See, e.g., *In re Burdan* (2008) 169 Cal.App.4th 18, 35 [86 Cal.Rptr.3d 549] ["while second degree murder does not involve premeditation, the Governor may consider facts suggesting Burdan planned and prepared for the murder"], citing *Rosenkrantz, supra*, 29 Cal.4th at pp. 678–679.)

this issue in *Lawrence*, the circumstances of the murder of which Rozzo was convicted are such that "we cannot find [its] remoteness has resulted in a loss of reliability as [a] predictor[] of future dangerousness." (*Hyde, supra*, 154 Cal.App.4th at p. 1216; see also *Tripp, supra*, 150 Cal.App.4th at p. 314 [Governor did not violate petitioner's right to due process in denying parole by relying solely on aggravated nature of commitment offense despite petitioner's considerable effort to rehabilitate herself].)

In contrast, in *Lawrence*, the petitioner killed her lover's wife after the two women "argued and physically struggled, pushed, threw punches, and at one point wrestled on the floor." (*Lawrence, supra*, 44 Cal.4th at p. 1193.) The *Lawrence* court noted that the petitioner committed the murder on the day she learned that her lover was going to renege on a promise to leave his wife. (*Id.* at pp. 1192–1193.) The court agreed with the Board that Lawrence committed the murder under circumstances that were not likely to recur, including the "significant emotional stress [she suffered] as a result of her love affair with the victim's husband." (*Id.* at pp. 1225–1226.) Thus, the murder in *Lawrence* was "mitigated by circumstances indicating the conduct [wa]s unlikely to recur . . . ." (*Id.* at p. 1191.)

Similarly, in *In re Vasquez* (2009) 170 Cal.App.4th 370, 385 [87 Cal.Rptr.3d 853] (*Vasquez*), this court concluded that the extenuating circumstances that led to a shooting were unlikely to recur. Vasquez murdered the former boyfriend (Miguel Alarcon) of his girlfriend (Maria Roth). This court described Alarcon's harassment, intimidation, and assault of Vasquez that preceded the killing as follows:

"In November 1990, Alarcon became angry after discovering that Roth was Vasquez's girlfriend and told Roth he would 'take a bat and beat the fuck out of [Vasquez].' Alarcon later confronted Vasquez and beat him up, causing Vasquez two black eyes and a swollen nose as well as a broken right wrist. Vasquez tried to avoid Alarcon by staying at his brother's house, but his car was broken into, rigged so that it would not start and items (later found in Alarcon's garage) were taken. Vasquez and Roth then moved to his sister's house, which Vasquez believed Alarcon would not be able to find. [¶] . . . [¶]

"[In early January 1991], Alarcon confronted Roth about her relationship with Vasquez and told her he would see her and Vasquez later that night and shoot them. After Roth told Vasquez what Alarcon had said about shooting them, they drove to a friend's house and borrowed a two-shot derringer. When Alarcon later found the couple, Vasquez had Roth get out of the car to hide and then drove off.

"Alarcon drove after Vasquez and rear-ended Vasquez's car. Vasquez stopped, got out and started pacing in front of his car. Alarcon also stopped

and Vasquez went to the driver's side door of his car. As Alarcon opened the door and started to get out, Vasquez fired his gun. A few seconds after Alarcon got out of the car, Vasquez fired a second shot and the men immediately started fighting. At some point, Alarcon stopped fighting, but Vasquez continued to hit and kick him." (*Id.* at pp. 375–376.)

The *Vasquez* court concluded, "While . . . there are some crimes so heinous that the nature of the commitment offense may render the inmate unsuitable for parole (*Rosenkrantz, supra*, 29 Cal.4th at p. 682), this is *not* one of those crimes and the evidence in the record shows that Vasquez does not pose an unreasonable risk to public safety." (*Vasquez, supra*, 170 Cal.App.4th at p. 386.) Unlike the commitment offenses reviewed in *Lawrence* and *Vasquez*, we cannot say that the record demonstrates that the circumstances that led to the murder at issue in this case are likely to recur.

In addition to examining Rozzo's commitment offense, we must also consider whether Rozzo's criminal history, conduct in prison, or his mental state, indicates that the circumstances of that offense remain probative in determining whether he is currently dangerous. (See *Lawrence, supra*, 44 Cal.4th at p. 1214.) The Governor properly noted that Rozzo had accumulated a substantial criminal record prior to the commitment offense. In the approximately 10-year period between November 1969, when Rozzo suffered his first conviction, and July 1980, when Heggie was murdered, Rozzo suffered numerous convictions for drug possession crimes. During this period, Rozzo also suffered convictions for disturbing the peace, theft, hit and run, and robbery. In addition, Rozzo violated conditions of probation and parole on numerous occasions. Thus, unlike the petitioner in *Lawrence*, who had no prior criminal record and for whom the "commitment offense was an isolated incident," Rozzo's commitment offense represented the "culmination of many years" of criminal behavior. (*Shaputis, supra*, 44 Cal.4th at p. 1259.)

During his first few years of incarceration for the commitment offense, Rozzo violated several prison rules, including possessing dangerous contraband in his cell and refusing to submit to a urinalysis. Such misconduct constitutes evidence of Rozzo's willingness to engage in serious rule breaking behavior despite having received a substantial criminal sanction.[8] While Rozzo's early institutional misconduct has decreasing probative value of his current dangerousness in light of intervening good behavior, such misconduct continues to have some probative value as to Rozzo's recidivist tendencies. (See *Lawrence, supra*, 44 Cal.4th at p. 1229.)

With respect to Rozzo's current mental state, the Governor noted that the record contains evidence that Rozzo lacks insight into the reasons why he

---

[8] Rozzo participated in the murder of Heggie after having previously committed a robbery for which he received a sentence with a maximum term of life in prison.

committed the commitment offense. We agree. First, and importantly, like the petitioner in *Shaputis*, Rozzo has not fully acknowledged his culpability for his commission of the murder. In *Shaputis*, the petitioner continued to claim that he had accidentally shot his victim, notwithstanding that the record contained considerable evidence that he had intentionally murdered his wife. (*Shaputis, supra*, 44 Cal.4th at p. 1260.) The *Shaputis* court noted that Shaputis's contention that the shooting had been an accident supported the conclusion that he had been unable to gain insight into his commission of the murder. (*Ibid.*)

In this case, while Rozzo has acknowledged participating in the beating and kidnapping of Heggie and has expressed remorse about Heggie's death, he has not acknowledged participating directly in the killing. In fact, in his memorandum of points and authorities in support of his petition for habeas corpus in this court, Rozzo asserts that it is "reasonably doubtful" that he participated in the murder, noting that two jurors wrote postverdict letters to the trial judge in which they indicated that they did not believe Rozzo had personally committed the murder. In his denial and traverse, Rozzo cites these postverdict letters and states, "Primarily, respondent has ignored or minimized the crucial fact that petitioner did not participate in the murder but was convicted, according to the most reliable source—the jurors—because he aided and abetted a kidnapping that enabled it." (Italics omitted.)

■ As noted previously (see fn. 7, *ante*), the Governor is not bound by the jury's findings regarding the facts of the commitment offense. It necessarily follows that the Governor is not bound by jurors' assessment of the evidence of the commitment offense as expressed in postverdict letters. Further, the Governor may consider all of the evidence in the record in evaluating the circumstances of a commitment offense. In this case, the record contains ample evidence that Rozzo directly participated in Heggie's killing. (See pt. II.A., *ante*.) Rozzo's claim that he "did not participate in the murder," indicates that Rozzo lacks insight into the reasons he committed the murder. (See *Shaputis, supra*, 44 Cal.4th at p. 1260.)

Second, despite strong evidence that Rozzo's motivation for the murder was racial hatred, Rozzo has denied such a motivation. For example, a 2001 "Life Prisoner Evaluation" states, "Rozzo continues to explain that Heggie's ethnicity was not a factor in his victimization." Similarly, a 1992 "Diagnostic Evaluation" states that Rozzo denied during group therapy sessions that the

crime was racially motivated. At his most recent parole hearing, when he was asked whether the crime had been racially motivated, Rozzo refused to answer the question.[9]

Further, there is no evidence that Rozzo has ever acknowledged that the murder was racially motivated or acknowledged that he ever harbored racial animus, in general. Nor is there any evidence that Rozzo has engaged in effective therapy or rehabilitative programming that might have eliminated such animus. We reject Rozzo's suggestion that a 2005 forensic psychological examination of Rozzo that Dr. Melvin Macomber performed demonstrates that Rozzo no longer harbors any racial animus. In discussing Dr. Macomber's evaluation, Rozzo states in his opening supplemental brief, "[I]f Mr. Rozzo's use of the 'n' word at the time [of the murder] could support the Governor's statement that the crime was racially motivated, that 26-year old fact would have no bearing upon Mr. Rozzo's current, forensically determined negligible parole risk unless the Governor set forth some evidence that such hostility prevails, but the current forensic evaluation completely dispels such a notion and the Governor suggested no such evidence."

To begin with, as Rozzo himself acknowledges, "the Governor . . . has broad discretion to disagree with his State's forensic psychologists. . . ." Further, the Governor was required to consider evidence in the record tending to demonstrate that Rozzo continues to harbor racial animus, including Rozzo's actions during the commission of Heggie's murder and the lack of any evidence demonstrating the reform of this aspect of his character. Finally,

---

[9] Citing Penal Code section 5011, subdivision (b) and title 15, section 2236, of the California Code of Regulations, Rozzo suggests that it is improper for this court to note Rozzo's failure to address whether the crime was racially motivated at his parole hearing. Section 5011, subdivision (b) precludes the Board from requiring an inmate to provide an admission of guilt in setting a parole date. Title 15, section 2236, California Code of Regulations provides in relevant part, "A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner."

While it is improper to rely on a prisoner's refusal to address the circumstances of the commitment offense in denying parole, evidence that demonstrates a prisoner's insight, or lack thereof, into the reasons for his commission of the commitment offense is relevant to a determination of the prisoner's suitability for parole. (*Shaputis, supra*, 44 Cal.4th at p. 1260.) For example, in *Shaputis*, the Supreme Court noted that the petitioner had refused to answer a question at his parole hearing regarding why he committed the murder. (*Id.* at p. 1252.) The *Shaputis* court ultimately concluded that the record contained some evidence that the petitioner lacked insight into his commission of the commitment offense. (*Id.* at p. 1260.) In this case, in light of Rozzo's refusal to discuss at the parole hearing whether the crime was racially motivated, the Governor was required to consider "other information available" (Cal. Code Regs., tit. 15, § 2236), concerning the crime. Evidence of Rozzo's use of racial slurs during the murder is among the information on which the Governor could have reasonably relied in concluding that the murder was motivated by racial animus.

and importantly, despite Dr. Macomber's conclusions that Rozzo has demonstrated insight regarding the murder, Dr. Macomber's evaluation does not address whether Rozzo was motivated by racial hatred in killing Heggie. Further, the evaluation does not discuss Rozzo's current attitudes regarding race. The absence of a discussion of Rozzo's historical or current racial attitudes in Dr. Macomber's report is particularly striking, in light of the strong evidence in the record that the victim's race was a primary motive for the murder. This evidence includes Rozzo's admission to Dr. Macomber that he remembered saying "[l]et me at that nigger," while beating Heggie.

Notwithstanding Rozzo's expressions of remorse, there is evidence that he lacks insight into the reasons why he participated in the murder of Heggie. (Accord, *Shaputis*, 44 Cal.4th at p. 1260 ["The record establishes, moreover, that although petitioner has stated that his conduct was 'wrong,' and feels some remorse for the crime, he has failed to gain insight or understanding into . . . his commission of the commitment offense."].) The circumstances of Rozzo's commitment offense thus continue to have probative value in predicting his current level of dangerousness. (See *Lawrence, supra,* 44 Cal.4th at p. 1228.)

██ There is some evidence in the record that after amassing an increasingly serious criminal record, Rozzo committed an entirely unprovoked, heinous, atrocious and cruel murder, motivated by racial hatred that Rozzo has never acknowledged. Applying *Lawrence* and *Shaputis*, we conclude that there is some evidence to support the Governor's decision that Rozzo remains unsuitable for parole.

B. *Rozzo has not demonstrated that the Governor failed to provide proper individualized consideration of his case, in violation of Rozzo's right to due process*[10]

Rozzo claims that the Governor violated his right to due process because the Governor did not personally review his case. Rozzo further contends that the Governor failed to provide individualized consideration of Rozzo's case because the Governor relied on the commitment offense as the basis for reversing the grant of parole. Rozzo notes that the Governor has done this in all cases in which he has reversed the Board's grant of parole. Rozzo also claims that the Governor routinely fails to apply the preponderance of the evidence standard in rendering his decisions, and that he failed to do so in this case.

---

[10] The Supreme Court did not address the issues discussed in part III.B.–D., *post*, in either *Lawrence* or *Shaputis*. Accordingly, our discussion of these issues is taken from our initial opinion in this matter.

Evidence Code section 664 provides, "It is presumed that official duty has been regularly performed." "Although this presumption is disputable [citation], it may not be disputed by proof that the [official] trained personnel advised and assisted the [official] (by drafting a proposed decision or otherwise) if the [official] . . . makes the actual decision." (*Board of Administration v. Superior Court* (1975) 50 Cal.App.3d 314, 320 [123 Cal.Rptr. 530].) "Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them." (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252].)

The Governor signed a three and one-half page statement of reasons explaining the basis for his reversal of the Board's decision in this case. The Governor's statement contains a discussion of the particular facts of Rozzo's offense, and outlines Rozzo's criminal history, his behavior in prison, his plans for parole, and his feelings about the offense. The Governor's statement of reasons detailing Rozzo's individual case constitutes evidence that Rozzo received individualized consideration of his case, and Rozzo has not presented any evidence that the Governor did not make the final decision in this case. Even assuming that the Governor routinely relies on prisoners' commitment offenses to reverse grants of parole, this would not prove that the Governor failed to give Rozzo's case individualized consideration. Further, assuming that the preponderance of the evidence standard applies to the Governor's decision regarding a prisoner's suitability for parole, Rozzo has not presented any evidence that the Governor failed to apply this standard in reaching his decision.

Accordingly, we conclude that Rozzo has failed to establish that the Governor did not provide proper individualized consideration of his case.[11]

C. *Rozzo has not demonstrated that the Governor has adopted an antiparole policy for murderers*

Rozzo claims that the Governor applies an antiparole policy to persons convicted of murder, and that this policy violates Rozzo's constitutional right to due process. In *Rosenkrantz*, the petitioner raised a similar claim and

---

[11] At oral argument, Rozzo's counsel conceded that the Governor provided individualized consideration of Rozzo's case. Counsel stated, "I'm not going to tell you . . . the Governor did not take an individual look at [Rozzo's] situation." When one of the justices noted that counsel had argued in his brief that the Governor failed to provide individualized consideration of Rozzo's case, counsel responded, "I have a law clerk that helps me . . . I can't observe everything the law clerk does." Counsel is responsible for briefs that bear his signature. We disapprove of Rozzo's counsel's suggestion to the contrary.

presented evidence that in the period between January 1999 through April 2001, former Governor Davis reversed 47 of 48 decisions in which the Board had granted parole. (*Rosenkrantz, supra*, 29 Cal.4th at p. 685.) The *Rosenkrantz* court rejected the petitioner's claim, reasoning, "As the Governor contends, the circumstance that the Governor has permitted the parole of two[12] persons convicted of murder is inconsistent with the conclusion that he has adopted a blanket policy of denying parole to all murderers." (*Ibid.*)

Rozzo asserts that the current Governor has reversed approximately 72 percent of parole dates granted in murder cases. Assuming for the sake of argument that Rozzo's statistics are correct, Rozzo's evidence of an antiparole policy is much weaker than the argument the *Rosenkrantz* court rejected. Accordingly, we conclude that Rozzo has failed to establish that the Governor has adopted an antiparole policy that violates Rozzo's right to due process.

D. *The composition of the Board did not violate Rozzo's right to due process*

Rozzo claims that the composition of the Board "insures bias and fundamental unfairness, and violates petitioner's liberty interest and right to due process vested by the State's parole laws and by the Due Process Clauses." Rozzo contends that the current Governor, and former Governors, have appointed, almost exclusively, former law enforcement personnel, antiparole legislators, and victim advocates to the Board. Rozzo claims that the Governors' exercise of their appointment powers in such a fashion is contrary to section 5075, subdivision (b). That section provides in part: "The selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross section of the racial, sexual, economic, and geographic features of the population of the state." (*Ibid.*)

Rozzo also claims that the Board lacks socioeconomic and geographic diversity. Assuming for the sake of argument that Rozzo's description of the composition of the Board is true, Rozzo fails to present any authority that suggests that individual prisoners have a due process right to any particular composition of the Board. Further, even assuming that the composition of the Board violated Rozzo's right to due process, Rozzo has failed to explain how he suffered any prejudice from such a violation in this case, since the Board found him *suitable* for parole. Accordingly, we reject Rozzo's claim.

---

[12] The *Rosenkrantz* court noted that former Governor Davis upheld an additional parole grant in the period between April 2001 and April 2002. (*Rosenkrantz, supra*, 29 Cal.4th at p. 685.)

## IV.

## DISPOSITION

The petition is denied.

McConnell, P. J., and McIntyre, J., concurred.

Petitioner's petition for review by the Supreme Court was denied June 24, 2009, S172228.